[Civ. No. 55852. Second Dist., Div. Two. Dec. 9, 1980.]

GREGORY J. DRUST, Plaintiff and Respondent, v.
CHESTER J. DRUST, Defendant and Appellant.

**4**

**COUNSEL**

Haight, Dickson, Brown & Bonesteel, Elliott D. Olson, Roy G. Weatherup and Jerry M. Custis for Defendant and Appellant.

Eckert & O'Gorman and Charles V. Eckert III for Plaintiff and Respondent.

OPINION

**BEACH, J.**—Personal injury action. Defendant Chester Drust appeals from a judgment rendered pursuant to a jury verdict awarding plaintiff Gregory Drust $1,436,000 in damages for injuries sustained as the result of defendant's negligent operation of an automobile in which plaintiff was a passenger. On appeal, defendant claims prejudicial error from the trial court's refusal to instruct on plaintiff's contributory negligence. He also contends that "substantial portions of the damage award were unsupported by evidence." We affirm the finding and judgment on liability but reverse that part of the judgment pertaining to damages.

FACTS:

At approximately 1 p.m. on March 14, 1973, defendant was driving his 18-year-old son (plaintiff) to class at the University of California at Santa Barbara, where plaintiff was a freshman. Defendant was driving 50 miles per hour on westbound Ward Memorial Boulevard, which leads directly to the university campus and which, up to the Sandspit overpass, is a divided highway with two lanes in each direction. A car driven by Maria Sanchez, a university employee, entered the highway at the Sandspit Road onramp and safely pulled in front of defendant's car. With Miss Sanchez was Veronica Gonzales, also a university employee.

Before westbound motorists get to the Sandspit overpass they are warned by signs reading, "Slow Traffic Ahead," "End Divided Road," "Do Not Pass," and "Two-Way Traffic." As Miss Sanchez approached the overpass, she noticed through her rearview mirror that defendant's car was "coming up fast." When defendant's car was about 150 feet behind hers, Miss Sanchez saw it cross the double yellow line and pull into the eastbound lane for oncoming traffic, in an apparent attempt to pass her. Just as Miss Sanchez reached the middle of the arched overpass, she observed a fast-approaching car in the eastbound lane. At that time, defendant's car was approximately one-car length to the rear of the Sanchez car. In Miss Sanchez' opinion, the oncoming car could not

have been visible to defendant because his car had not yet reached the top of the overpass. Almost instantaneously, Miss Sanchez heard the screeching of brakes coming from defendant's car and saw it collide headon with the eastbound car driven by Donna Neuhart. The collision was also observed by Charles Oehmke who until defendant's car crossed into the eastbound lane had been traveling about five car lengths behind defendant's car. Miss Neuhart and both Drusts had no recollection of the collision. Defendant remembered only seeing an approaching car "right in front" of him and calling out to his son that they were going to crash. Plaintiff Gregory Drust suffered fractures of the face and skull and lost the sight in both eyes.

DISCUSSION:

### 1. *Trial Court's Refusal to Instruct on Contributory Negligence*

██ ██ ██ ██ When contributory negligence[1] is alleged as a defense, a trial court must instruct on that issue if there is substantial evidence to support it. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 548 [138 Cal.Rptr. 705, 564 P.2d 857]; *Van Pelt* v. *Carte* (1962) 209 Cal.App.2d 764, 769 [26 Cal.Rptr. 182].) The requisite standard cannot be met by mere speculation or conjecture. (*Hasson* v. *Ford Motor Co., supra,* at p. 548.) ██ The burden of proving contributory negligence rests upon a defendant. (*Van Pelt v. Carte, supra,* at p. 769.)

██ In arguing that there was substantial evidence of plaintiff's contributory negligence, defendant relies on certain testimony by eyewitnesses Maria Sanchez and Charles Oehmke. Miss Sanchez testified that when she looked through her rearview mirror just before the collision, she saw defendant face plaintiff "as if they were in some sort of conversation." Mr. Oehmke testified that while traveling behind defendant's car, he saw defendant look at his son numerous times, and that he also saw defendant do so just before the collision. The foregoing tes-

---

[1]In *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], the California Supreme Court abolished the "all-or-nothing" doctrine of contributory negligence and replaced it with a system of comparative negligence, which assesses liability in direct proportion to fault. Though today the term "contributory negligence" is still used, it now means simply that if the trier of fact finds that a plaintiff was also at fault for the accident, it must reduce the total amount of the plaintiff's damages by the proportion or percentage of negligence attributable to the plaintiff.

timony, defendant argues, shows that plaintiff distracted defendant's attention from the narrow overpass ahead. We reject the argument. There was no direct evidence regarding plaintiff's actions at or immediately before the instant of impact. (*Mize* v. *Atchison, T. & S. F. Ry. Co.* (1975) 46 Cal.App.3d 436, 454 [120 Cal.Rptr. 787].) There was no testimony whatsoever that plaintiff initiated a conversation with defendant or that he even responded to anything defendant was saying, assuming that defendant did in fact address plaintiff rather than just look at him. All the evidence shows is that defendant turned his head toward plaintiff.

Defendant further contends that plaintiff was contributorily negligent for not warning defendant about the manner in which defendant was approaching the overpass. ██ In the absence of some fact brought to his attention which would cause a person of ordinary prudence to act otherwise, a passenger in an automobile has no duty to observe traffic conditions on the highway, and his mere failure to do so, without more, will not support a finding of contributory negligence. (*Robinson* v. *Cable* (1961) 55 Cal.2d 425, 427 [11 Cal.Rptr. 377, 359 P.2d 929].) In other words, an automobile passenger's "duty to look" does not arise until some factor of danger comes to his attention, thus charging him as a person of ordinary prudence to take steps for his own safety. (*Van Pelt* v. *Carte, supra*, 209 Cal.App.2d 764, 770.) ██ Here, there was no evidence whatsoever suggesting that plaintiff was aware defendant had entered a "No Passing" zone or was traveling in the "wrong lane." Prior to the accident, plaintiff may have glanced at reading matter or closed his eyes in rest; or he may have had his attention on "any other of a hundred things." (*Id.* at pp. 769-770.) Immediately upon discovering the fast-approaching automobile defendant, while braking sharply to avoid a collision, told plaintiff they were going to crash. This evidence indicates that the interval between the appearance of danger and the actual collision was too short to justify the conclusion that any act by plaintiff would have affected defendant's conduct. (*Swink* v. *Gardena Club* (1944) 65 Cal.App.2d 674, 680 [151 Cal.Rptr. 313].)

Under the circumstances, it is difficult to see how any act or failure to act on the part of plaintiff in any way contributed to his injuries. (*Thompson* v. *Keckler* (1964) 228 Cal.App.2d 199, 215 [39 Cal.Rptr. 267]; *Swink* v. *Gardena Club, supra*, at p. 680.) The trial court, therefore, acted properly in not submitting the issue of plaintiff's contributory negligence to the jury.

## 2. *Damage Award*

■ A reviewing court must uphold an award of damages whenever possible, and all presumptions are in favor of the judgment. (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 61 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) That an award may be relatively large does not alone render it suspect. (*Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 654-655 [151 Cal.Rptr. 399].) The determination of damages is primarily a factual matter on which the inevitable wide differences of opinion do not call for the intervention of appellate courts. Such intervention is proper only if the award is so large that, at first blush, it shocks the conscience and suggests passion or prejudice by the jury. (*Ibid.*)

■ At bench the jury rendered a general verdict in favor of plaintiff awarding him damages in the sum of $1,436,000. In view of the catastrophic injuries and losses disclosed by the evidence, including the resulting permanent blindness, we cannot say that as a matter of law the award is excessive merely because it is large. Nonetheless, that observation does not resolve another particular problem presented to us. That problem is that in arriving at the award, the jury incorrectly included inconsistent elements of damage. This fact is learned from the signed declarations of all 12 of the jurors, submitted to the trial court by plaintiff himself for another purpose, which we shall discuss later, and now also relied upon by defendant. The declarations recite a breakdown of the amount awarded in the jury's general verdict. According to their declarations, the jurors awarded plaintiff $604,000 for loss of future earning capacity, $632,000 for future expenses in connection with the injuries, and $200,000 for pain and suffering, for a total of $1,436,000. The declarations do not indicate how the jury arrived at the $632,000 figure for future expenses. However, on appeal defendant gives us an item-by-item breakdown with a specific amount for each item to demonstrate how the jury must have arrived at the $632,000 allocation. ■ Defendant claims that since those declarations were "injected...into the record" by plaintiff, defendant may properly use those declarations to attack the jury's allocation of $632,000 for future expenses.

Evidence Code section 1150 provides: "(a) Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, ei-

ther within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.

"(b) Nothing in this code affects the law relating to the competence of a juror to give evidence to impeach or support a verdict." ▮ Accordingly, posttrial solicitation and use of jurors' statements concerning their conduct and deliberation and which seek to explain the effect of evidence upon their mental processes is improper. On the other hand, use of a juror's affidavit or declaration is proper to disclose objectively ascertainable overt acts by the jury. (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 80-81 [137 Cal.Rptr. 863, 562 P.2d 1022].) At bench the nature of the declarations and the conduct disclosed by them is similar to those in *Krouse* v. *Graham, supra.* There, in arriving at the total damages determined to be due, the jury included as damages an improper and unrecoverable element for attorneys' fees. In permitting use of jurors' affidavits to impeach a verdict, the court in *Krouse* v. *Graham* explained that where the affidavit is susceptible of disclosing the jury's overt acts objectively ascertainable, the affidavit is admissible. This is the case here. ▮ Although the declaration might be, as plaintiff claims, evidence of the jury's reasoning process and therefore inadmissible, the declarations are more susceptible of being interpreted as describing the overt act of awarding a particular sum for a particular element of damage. As such, the declarations properly may be used.

Another feature of this case prompts us to conclude that reference by defendant to the jurors' declarations is not only substantively permissible but required by considerations of justice and fair play. As we noted earlier, it was plaintiff, not defendant, who placed all 12 declarations into the record. While the doctrine of "invited error" can be misused to wrongly perpetuate a mistake with illogical and totally unbalanced consequences, that is not the result at bench. Here the facts and figures creating the problem of the inconsistent award went into the record. The following brief summary of the posttrial occurrences help demonstrate the posture of the case and how the jurors' declarations came to be used:

(1) The jury rendered a general verdict in the amount of $1,436,000. There was no itemization or breakdown or allocation of any of its component parts.

(2) Thereafter, defendant made a motion for new trial. In support of the motion, defense counsel declared, "The foreman of the jury, Mrs. Ulbrecht, stated that of the total verdict, $602,000 was allocated to lost earnings and $632,000 was allocated to future care, including services of a reader."[2]

(3) In a declaration in support of his opposition, plaintiff's counsel, referring to the use of Mrs. Ulbrecht's remarks, stated: "...This is improper, and [such use of her remark]...should be stricken, and motion to so do is hereby made."

(4) Plaintiff submitted a memorandum of costs. Included therein was an item requesting as costs an allowance of $10,649.60 as expert witness fee for the economist, Dr., Johnson. Defendant moved to tax the requested cost, especially as to Johnson's claimed expert's fees.

(5) In his declaration opposing the motion to tax the costs, plaintiff's attorney asserted the importance of Dr. Johnson's testimony. In seeking to demonstrate that importance, plaintiff's counsel said, "The proof of the pudding, as the saying goes, is in the eating. [¶] Of the $1,436,000.00 verdict, $1,236,000.00 was for the economic losses testified to by DR. JOHNSON. *See the Declarations of the jurors, attached hereto, incorporated herein by this reference,...*" (Italics added.) With this declaration, *plaintiff's* attorney filed the declarations of all 12 jurors. All of these declarations were prepared by plaintiff's attorney. They were identical. All of the declarations described in identical language the several components of the total sum, as follows: "The $1,436,000.00 was made up of the following, which 10 of us, including myself, agreed on:

| | |
|---|---|
| Present value of future earnings/earning capacity .... | $604,000.00 |
| Present value of expenses to be incurred in the future, because of injuries ........................ | 632,000.00 |
| Pain and suffering ............................. | 200,000.00 |
| TOTAL ....................................... | $1,436,000.00" |

[2]No written declaration of Mrs. Ulbrecht or of any other juror was submitted at that time. We have searched the record but are unable to find how and when this communication was made by the juror and to whom. Thus we cannot assume that it was improperly solicited rather than merely volunteered, possibly in an informal posttrial discussion by members of the jury and all counsel.

By reason of the nature of the declarations, combined with the manner in which they came into the record, we conclude that it is not improper to consider the information thus presented. The information discloses an error in determining the elements of damage. We are not required to ignore information which legitimately appears in the record. Plaintiff directs us to no authority which allows him to use the documents containing this information only for his benefit but denies defendant the right to use the same factual information. Putting information into the record is not a one-way street.

The evidence shows that of the award of $632,000 for future expenses, the much greater portion thereof, $539,448 was for the purpose of employing a reader-helper-driver. This award was for an inconsistent item because the jury had already determined that plaintiff would not earn income in the future. The jury had made a determination of the value of the amount of that lost future income. To award an item of expense necessary to earn income in the future (the loss of which has already been compensated) is patently inconsistent. Plaintiff argues that the present value of future income was actually $1,206,000 and that the jury simply reduced the award by the amount plaintiff would earn with the aid of the reader-driver-helper. Unfortunately, that is plaintiff's analysis only and not what the jurors' declarations said or explained. Moreover, this analysis assumes that the jury totally accepted the opinion of the economist. That assumption, however, is prima facie inconsistent with the language of the jurors' declarations. Plaintiff's counsel himself prepared these declarations. Reading them and accepting them at face value, it is apparent that they contain a patent inconsistency which requires a reconsideration of the evidence on damages. Appellant points out that some of the other elements of damage which make up the $632,000 of expenses were not entirely supported by any evidence that they were reasonably certain to be incurred. In view of the reversal required, we need not address the question of the validity of the remaining other nine elements of special damage which constituted the remaining part of the $632,000 award for future expenses.

That portion of the judgment finding defendant liable to plaintiff is affirmed. That portion of the judgment relative to damages only is reversed and the matter is remanded to the trial court for retrial on the issue of damages only.

Fleming, Acting P. J., concurred.

**COMPTON, J.**—I dissent from that portion of the majority opinion which reverses the damage award in favor of plaintiff.

My disagreement with the majority stems not from any belief on my part that the jury's arithmetic was correct or that the damages were not excessive but from the fact that the declarations of the jurors, which the majority uses to uncover the error, are clearly incompetent as evidence upon which to impeach the verdict.

I start with the prosposition that the use of juror affidavits in connection with motions for new trial has reached epidemic proportions and should be discouraged wherever possible. It should be a very rare occasion, indeed, where the declarations of jurors, given after a trial, concerning what went on during jury deliberations should be used as a basis for upsetting the verdict which was returned.

In my opinion, *Krouse* v. *Graham* (1977) 19 Cal.3d 58 [137 Cal. Rptr. 863, 562 P.2d 1022], upon which the majority relies, was wrongly decided and I do not hesitate to suggest that the Supreme Court should rethink the rationale of that case.

No amount of semantics or legal legerdemain can convert a jury's mathematical computations from a "mental process" to an "overt act." Even accepting the correctness of the *Krouse* rationale (something which I concede we are bound to do), the error was infinitely easier to discern and thus more "objective" in nature than is the case here. It takes some rather subtle reasoning to "puzzle out" the jury's mistake in the case at bench.

It is just this sort of exercise that the language of Evidence Code section 1150 was designed to prevent. I read that section as meaning that a juror's testimony is only competent to impeach a verdict when it relates to improper extraneous influences having been brought to bear on the jury. Even in that extreme case evidence of the effect of such influence on the juror's mind is inadmissible.

Here there was no extraneous influence to which the jury was subjected nor was the jury guilty of any misconduct. They received no evidence other than that which the court admitted in the trial. The declarations of the jurors revealed nothing but their mental processes in arriving at the amount of damages to be awarded.

Finally, while I am tempted to apply the doctrine of invited error to the plaintiff because he produced these declarations, I am of the opinion that the language of the statute is absolute. "No evidence is admissible...concerning the mental processes...." means to me that such declarations are not competent for any purpose and it makes no difference how they found their way into the record.

The majority appears to believe that the damages awarded were excessive. If so, it should be so stated. Under Code of Civil Procedure section 657, subdivision 5, excessive damages are grounds for granting a new trial. The application of that subdivision, however, does not require any evidence concerning the jurors' conduct in the jury room or their mental processes. The determination of whether the damages are excessive is made simply on the basis of the evidence presented at the trial and the amount of the jury's award.

It is wrong in my opinion to follow the circuitous path of examining the jurors' declarations, finding an error in the arithmetic and then calling it "jury misconduct" when the real vice, if one exists, is that from an objective view the damages were excessive.

I would affirm the judgment in its entirety.

A petition for a rehearing was denied January 5, 1981. Compton, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied February 5, 1981. Mosk, J., was of the opinion that the petition should be granted.